UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD CAVANAUGH, ) | CIV-F-06-0119 AWI DLB |
| ) | |
| Plaintiff, ) | ORDER RE: DEFENDANT'S |
| ) | MOTION FOR SUMMARY |
| v. ) | JUDGMENT |
| ) | |
| UNISOURCE WORLDWIDE, INC. and ) | |
| DOES 1 through 50 inclusive, ) | |
| ) | |
| Defendant. ) | |

Plaintiff has filed suit against Defendant on the basis of age discrimination in employment. The matter is before the court on Defendant's motion for summary judgment. Plaintiff has filed a timely opposition and Defendant has filed a timely reply. The matter was taken under submission without benefit of oral argument.

**I. History**

Defendant Unisource Worldwide, Inc. ("Unisource") sells and distributes commercial paper products to commercial printers. Plaintiff Richard Cavanaugh ("Cavanaugh") has been and is currently employed as a sales representative in Unisource's Fresno office. Sales representatives are paid a salary by Unisource and a commission based on the profits from their sales to clients. In 2003, Cavanaugh has 20 sales accounts (more than any other sales representative in Fresno), and Unisource awarded him the Pinnacle Award, which is a distinction

1

for the top ten percent of its sales representatives.  Cavanaugh was born on December 2, 1940 and has been employed in the paper selling industry for decades.

In 2003-2005, there were personnel changes within Unisource; the parties have not stated any reasons for these changes.  Steve Teal ("Teal"), the existing business manager for the Fresno office was replaced in February 2004 by Tom Quallick ("Quallick"), the preexisting business manager for the Sacramento office.  In February 2005, Teal reassumed management of Unisource's Fresno office.  In 2003 and 2004, before and during his management of the Fresno office, Quallick removed sales representatives from approximately 20 accounts and reassigned those accounts to other sales representatives.  Among the accounts reassigned were two serviced by Cavanaugh.  The reassignment of these two accounts form the basis of this suit.  During this time, Donna Tkel ("Tkel ") was the human resources director.  Robert Mangasarian ("Mangasarian") was a former business manager for Fresno and Vince Clubb ("Clubb") was the marketing director for Unisource's northwest area, which includes Fresno.

One of Cavanaugh's clients was ProDocument Solutions ("ProDocument") which had plants in Porterville[1] and Paso Robles.  Unisource sold carbonless roll paper manufactured by Appleton Paper, a third party, to ProDocument.  Cavanaugh was originally the sales representative for both of those plants.  In March 2003, service of the Porterville plant was reassigned to John Tienken ("Tienken"), another sales representative in Fresno who had occasionally sold other paper products to ProDocument, at the client's request.  Cavanaugh's suit is not based on reassignment of responsibilities for the Porterville plant.  In May 2004, Appleton Paper informed Unisource that ProDocument was threatening to transfer their business to a competing foreign paper manufacturer.  Clubb and Quallick met with ProDocument representatives.  After the meeting, Quallick reassigned the Paso Robles facility to Tienken.  Cavanaugh alleges that the reassignment of the Paso Robles plant is due to age discrimination.

The other account in question concerned Dumont Printing, Inc. ("Dumont").  Cavanaugh

---

[1]ProDocument's plant was originally located in Visalia but moved to Porterville in the middle of the events described in the lawsuit.  Following Unisource's lead, the court will simply refer to both facilities as the Porterville plant.

was the longstanding sales representative for Dumont and personal friend of its owner Larry Early. Starting in 2002-2003, Unisource began losing its Dumont sales to XPEDEX, a competitor. Teal and Cavanaugh met with Dumont representatives in May 2003 to discuss how Unisource could keep Dumont's business. In October 2003, Unisource removed Cavanaugh from the account. At Dumont's request, Cavanaugh was reinstated. In July 2004, Quallick reassigned the account to Greg DeGrange ("DeGrange"). Unisource paid Cavanaugh $2,000 per month for 12 months to compensate Cavanaugh for the lost commissions and/or to help train DeGrange on the Dumont account. DeGrange's employment with Unisource was terminated in June 2005 and the account was reassigned to another sales representative. Cavanaugh alleges that the reassignment of the Dumont account is due to age discrimination.

After the reassignments, Cavanaugh made an internal complaint of age discrimination within Unisource. Tkel investigated the allegation and informed Cavanaugh that he was removed from the accounts due to lack of customer satisfaction. On December 27, 2005, Cavanaugh filed this present suit against Unisource, alleging state causes of action grounded in age discrimination, tortious violation of public policy, interference with prospective economic advantage, and breach of the implied covenant of good faith and fair dealing. Cavanaugh seeks compensatory damages including lost wages and/or employment benefits, mental and emotional distress damages, and punitive or exemplary damages. Unisource filed this motion for summary judgment, seeking to have all four of Cavanaugh's causes of action dismissed. Cavanaugh, in turn, makes objections on various grounds to some of the evidence proffered by Unisource in support of this motion. The court has relied on admissible evidence in rendering this decision; any specific evidentiary concerns pertinent to the decision are addressed below. Factual assertions by Unisource which are controverted with evidence by Cavanaugh are not discussed or relied upon.

## II. Legal Standards

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Proc. 56(c). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

**4**

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts....Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, citation omitted.

## III. Discussion

**A. Age Discrimination**

FEHA outlaws employment discrimination against individuals over 40. See Cal. Gov't Code §12941. "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination, including age discrimination." Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 354 (Cal. 2000). "A plaintiff must first establish a prima facie case of discrimination. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994), citations omitted.

**1. Prima Facie Case**

"The specific elements of a prima facie case may vary depending on the particular facts. Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 355 (Cal. 2000). Cavanaugh was 63 in 2004. He had received an award from Unisource for his job performance in 2003. Two of his accounts were taken away from him. The accounts were given to younger employees who were not more experienced or qualified than Cavanaugh. The burden for stating a prima facie case is not heavy. See Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir. 1996). Cavanaugh has made a prima facie case.

**2. Legitimate Non-Discriminatory Rationale**

In turn, Unisource asserts that Cavanaugh mishandling of the Dumont and ProDocument accounts was the legitimate, non-discriminatory reason for reassigning them to other sales representatives. Specifically, Unisource claims that "sales sharply declined at both Dumont and ProDocument, Dumont and ProDocument managers expressed their dissatisfaction with Plaintiff, Plaintiff failed to show respect for Dumont's new decision-maker, and ProDocument preferred Tienken over him. Doc. 47, Brief, at 18:13-17.

**a. ProDocument Account**

ProDocument has two plants, in Porterville and Paso Robles. Prior to 2003, Cavanaugh was the carbonless roll paper sales representative for both facilities. The managers at ProDocument had contact with Tienken who occasionally sold other specialty paper products to ProDocument. In early 2003, Faye Phillips, ProDocument's System Administrator, together with Lonnie Marvin, the Porterville Plant Manager, told Teal (business manager in Fresno at the time) that they wished for Tienken to be their sales representative for the Porterville plant. Doc. 45, Ex. B., Faye Phillips Deposition, at 17:6-8; Doc. 45, Ex. E, Marvin Deposition, at 23:14-16. Faye Phillips said, "With [Tienken] I could reach him, he would jump right on it, and I would have an answer." Doc. 45, Ex. B, Faye Phillips Deposition, at 21:1-3. In contrast, Faye Phillips did not know that Cavanaugh was the existing sales representative, saying "If a person doesn't call on you to see what you need, you don't realize that person is you rep." Doc. 45, Ex. B., Faye Phillips Deposition, at 19:8-10. Faye Phillips expected to receive either a visit or a call from a sales representative once a month. Doc. 45, Ex. B., Phillips Deposition, at 48:12-17. Unisource reassigned responsibility for the Porterville plant to Tienken in 2003. Cavanaugh does not allege that this reassignment was motivated by age discrimination.

Linda Keith, President of ProDocument, worked out of the Paso Robles facility. She said that there were times that she thought Cavanaugh was no longer the sales representative because "the fact that you never heard from him or saw him, you just assumed, you thought maybe he got promoted somewhere else." Doc. 45, Ex. D, Keith Deposition, at 60:14-61:6. With respect to

Tienken's contact with ProDocument, she stated, "there was a rep there [in Porterville] I saw quite a bit, all the time, John Tienken. And there were even times when there was a problem in the Paso facility and I would go up to John and say, 'Hey, John, we're in a jam, we need...' and sure enough, John would have it at the doorstep in Paso." Doc. 45, Ex. D, Keith Deposition, at 33:11-14.  Linda Keith expressed a desire within the ProDocument organization to have Tienken handle both Porterville and Paso Robles accounts and she gave verbal approval to have that arranged. Doc. 45, Ex. D, Keith Deposition, at 35:6-18 and 67:11-21.  Though she does not recall the matter specifically, Linda Keith believed she complimented the sales service of Tienken in front of Unisource management. Doc. 45, Ex. D, Keith Deposition, at 35:6-18 and 67:11-21.

      Cavanaugh admits that "sales on the Paso Robles account decreased over $700,000 in 2003." Doc. 55, Cavanaugh's Separate Statement of UMF, at 7:4-6.  Richard Molsby, ProDocument's CFO said "Appleton, they gave very good service. Unisource, we never saw them." Doc. 45, Ex. C, Molsby Deposition, at 16:16-17.  He complained that "we're paying for them and they're providing no service. And that was one of the major reasons why I encouraged the company to swing away from that relationship [with Unisource]." Doc. 45, Ex. C, Molsby Deposition, at 22:12-15.  At the May 2004 meeting discussing whether ProDocument would continue purchasing from Appleton and Unisource, ProDocument made a request that Tienken be their sole sales representative.  While it was Unisource that had the authority to and ultimately did reassign the account, Linda Keith stated that ProDocument asked for the reassignment. Doc. 45, Ex. D, Keith Deposition, at 41:2-4.  Quallick made the decision to reassign the account the same day as the meeting with ProDocument representatives, without speaking beforehand with anyone in human resources or with Cavanaugh.  In response to Cavanaugh's inquiries regarding his removal from the Paso Robles account, Linda Keith told him that "we all decided we, you know, just wanted one rep. It was a decision. We just felt it was easier for the company." Doc. 45, Ex. D, Keith Deposition, at 40:18-21.

      In explaining his lack of contact with individuals at ProDocument, Cavanaugh alleges that George Phillips, CEO/Owner of ProDocument told him, "because ProDocument was purchasing the carbonless paper directly through Appleton it would not be necessary for

Cavanaugh to call on ProDocuments on a regular basis unless he was needed." Doc. 54, Opposition, at 6:11-13. However, the cited part of the deposition is not quite as clear cut:

> Q. Do you recall that you did say something to Richard Cavanaugh to the effect that regarding these two products, the NCR carbonless paper and the security bond paper that he did not need to go to Paso Robles personally on a regular basis?
>
> A. Not in that frame. Again, I recall mentioning to [Cavanaugh] that because of the relationship that we had with NCR that it probably wasn't necessary to do that, but again I don't recall what year it was. It was a long time ago. And I don't recall the exact words, but I think it was more framed on the basis of we had representation on an ongoing basis with NCR, and if I truly needed assistance, I would probably call [Cavanaugh]. Keep in mind that I was not the purchasing agent. I was not the person actually doing the purchasing. So we need to frame that in the perspective of how I think it might have happened, but that was a long time ago.

Doc. 59, Ex. 11, George Phillips Deposition, at 18:8-25.

**b. Dumont Account**

Cavanaugh was personal friends with Larry Early, the owner of Dumont. In 2001, Larry Early was diagnosed with cancer and turned over the management of the company to Susan Moore. Susan Early, Larry Early's wife, also gradually withdrew from the operations of the company to care for her husband. In May 2003, Teal and Cavanaugh had a meeting with representatives of Dumont, including Susan Moore. Cavanaugh admits, "Unisource management observed [Cavanaugh] 'squeeze' [Susan Moore] and call her 'honey.' Unisource management called Moore to inquire whether [Cavanaugh's] behavior offended her." Doc. 55, Cavanaguh's Separate Statement of UMF, at 11:22-26. Susan Moore assured Unisource that she was not offended as she had known Cavanaugh for years. Unisource removed Cavanaugh from the account in October 2003. When she was informed of the change, Susan Moore immediately called Unisource to request Cavanaugh's reinstatement because "it appeared to me that management was making decisions based on what they thought my relationship might have been or not been with Richard Cavanaugh. That had nothing to do with whether we were purchasing paper from Unisource or not." Doc. 45, Ex. G, Moore Deposition, at 27:12-20. Unisource complied and reinstated Cavanaugh.

Cavanaugh does admit Susan Moore felt that he "insisted on conducting business with

Mr. Early rather than with her and that he failed to understand that she was running the day-to-day operations of Dumont." Doc. 55, Cavanaguh's Separate Statement of UMF, at 12:4-13. Regarding this incident, Susan Early said Larry Early "was upset that he was being called by Dick [Cavanaugh] while he was so sick to intervene on his behalf."[2] Doc. 45, Ex. F., Susan Early Deposition, at 58:22-25. She then "asked Mr. Cavanaugh not to talk with Larry about business things." Doc. 45, Ex. F., Susan Early Deposition, at 60:1-3

Prior to 2002, Unisource was Dumont's main paper supplier of offshore coated paper, with sales of over $1 million dollars per year. Afterwards, sales declined precipitously; Cavanaugh's best estimate of the yearly business lost to XPEDEX was "Approximately one million dollars." Doc. 45, Ex. A, Cavanaugh Deposition, at 72:10-18. Susan Early said that XPEDEX became Dumont's favorite supplier beginning in 2003 due to "more competitive pricing and better service. Doc. 45, Ex. F., Susan Early Deposition, at 48:9-18.

Cavanaugh asserts that "no one from Dumont had any criticisms regarding Cavanaugh's handling of the account." Doc. 54, Opposition, at 12:1-2. However, Susan Early asked Cavanaugh sometime after 2003 to "go above and beyond the call of duty" but stated that he did not do so, unlike the sales representative of XPEDEX. Doc. 45, Ex. F., Susan Early Deposition, at 64:20-65:4. Specifically, Cavanaugh was not "Shipping paper overnight, getting orders right, being on the dock if there was a problem at any time of the day or night, meeting shipments to be sure that they were right, being very aggressive and competitive with pricing on a contractual and on a per order basis, getting the paperwork right, being extremely responsive with requests for paper samples for our account representatives, and making- making it so that we didn't have to birddog their work." Doc. 45, Ex. F., Susan Early Deposition, at 61:12-62:8.

Teal states he gave Cavanaugh the authority to "do whatever it took to retain the Dumont business, including offering Dumont Price concessions and rebates" in the fall of 2002. Doc. 43, Teal Declaration, at 3:8-11. Cavanaugh does not recall, but does not deny that Teal gave him

---

[2]The statement is hearsay but admissible for the purpose of conveying Larry Early's then existing mental, emotional, and physical condition under Fed. R. Evid. 803(3).

that authority. Doc. 45, Ex. A, Cavanaugh, Deposition, at 171:4-9.  Cavanaugh admits "Unisource management also acknowledged Plaintiff's potential to lose the business and instructed Plaintiff to lower the prices to meet the competition." Doc. 55, Cavanaugh's Separate Statement of UMF, at 13:13-16.  In discussing pricing with Teal in preparation for the May 2003 meeting with Dumont, Cavanaugh said that "I made a recommendation that we had been selling Dumont for $60 a hundred weight for several, several years, and it wouldn't be a very good idea to cut our price." Doc. 45, Ex. A, Cavanaugh, Deposition, at 181:15-182:6.  He "told Steve Teal that if the price was dropped all of a sudden to $55.00 from $60.00 Larry Early would have requested a rebate [retroactively applied to past sales] and Richard Cavanaugh did agree with giving Dumont Printing a rebate back a percentage of their volume and that Steve Teal could do whatever he wanted, however, the price concession of 2 percent rebate would have a net effect of reducing the price from $60.00 to $57.50." Doc. 55, Cavanaugh's Separate Statement of UMF, at 13:13-21.

Cavanaugh admits that "Dumont directed its carbonless paper business to XPEDEX based on its lower price, a displacement representing a loss of approximately $1 million dollars in sales a year.  Plaintiff admits this loss occurred while he was assigned to the account....Dumont felt that Plaintiff had 'betrayed' them after learning that their competitors, who were buying smaller volume from Plaintiff, had been receiving lower prices on paper." Doc. 55, Cavanaugh's Separate Statement of UMF, at 14:2-15.  Further, Cavanaugh admits he "knew that there was a potential to lose the Dumont business to XPEDEX....[He] did not know how much Dumont business Unisource lost to XPEDEX during his final 12 months on the account. [He] was out-serviced and under-priced by XPEDEX." Doc. 55, Cavanaugh's Separate Statement of UMF, at 13:11-28.  Susan Moore asked Cavanaugh in 2003 to lower his price and that "I had been telling Unisource and Mr. Cavanaugh that the price was too high from the time that the business started to decline." Doc. 45, Ex. G, Moore Deposition, at 70:11-23.  Susan Early recalls that Cavanaugh specifically said "it wasn't possible for him to lower [the price.]" Doc. 45, Ex. F., Susan Early Deposition, at 51:25-52:1.  She also said Larry Early expressed criticism of Cavanaugh saying, "he felt betrayed...when we learned that we had been receiving- we were

11

being sold paper at a higher rate than competitors who bought lesser quantities and it was based on a decision made by Dick Cavanaugh."[3] Doc. 45, Ex. F, Susan Early Deposition, at 19:12-20:2.

**3. Pretext**

Cavanaugh argues that Unisource's rationale for removing him from the accounts are mere pretexts for age discrimination. The evidence he presents includes a letter which potentially contradicts Unisource's position regarding why the accounts were reassigned, statements by Unisource officials that may indicate some bias against him based on his age, and his assertion that DeGrange was given the Dumont account because he needed more clients.

Tkel sent a letter to Cavanaugh in response to his internal complaint of age discrimination stating, "There are a variety of justifiable reasons for a customer to be removed from one Sales Professional's responsibility and assigned to another. For example, an account may be reassigned if sales at a customer have declined, if the account is identified as having potential growth and growth doesn't occur at an acceptable rate, or if the customer is not satisfied with the level of service the Sales Professional provides....[the two accounts] were both reassigned as a result of lack of customer satisfaction." Doc. 59, Ex. 9, appended Aug. 22, 2004 letter. The Tkel letter only cites customer dissatisfaction as a rationale for the reassignment while Unisource now claims that a variety of reasons, of which only one is customer dissatisfaction, contributed to the decision to reassign the two accounts. An employer's stated reason for dismissal of an employee should not be read alone, but understood in the context of the evidence presented. See <u>Horn v. Cushman & Wakefield Western, Inc.</u>, 72 Cal. App. 4th 798, 813-4 (Cal. Ct. App. 1999). With regards to both Dumont and ProDocument, Unisource has presented evidence that the clients were not completely satisfied with the way Cavanaugh was servicing their accounts. It is also uncontested that sales to Dumont and ProDocument were waning while Cavanaugh was the sales representative. Unisource has also alleged that Cavanaugh was resistant to suggestions from

---

[3]The statement is hearsay but admissible for the purpose of conveying Larry Early's then existing mental and emotional condition under Fed. R. Evid. 803(3).

management on how to better manage the accounts. The rationale Tkel gave for reassignment of the accounts is supported by the record. The fact that it may not have provided all the reasons for the decision, the secondary factors, does not give rise to suspicion of pretext. The California Supreme Court has gone so far as to say "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons." Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 360 (Cal. 2000).

Cavanaugh also argues that comments made by Unisource personnel demonstrate discrimination was the real basis for the reassignments. With regards to the Dumont account, Cavanaugh alleges that Quallick said something to the effect of "maybe young blood will help regain some of that business." Doc. 59, Ex. 1, Cavanaugh Deposition, at 212:21-23. However, Cavanaugh does not remember when Quallick said it or who Quallick said it to; he claims to have overheard it. Doc. 59, Ex. 1, Cavanaugh Deposition, at 213:3-21. Further, Cavanaugh admits that the phrase "young blood" or "younger blood" is his own and may not have come from Quallick. Doc. 59, Ex. 1, Cavanaugh Deposition, at 212:8-13. In addition, DeGrange told Susan Moore at Dumont that the reason he was the new sales representative was due to the fact that Cavanaugh was retiring. Cavanaugh argues that "No management person from Unisource ever told Moore that DeGrange['s] statement regarding Cavanaugh retiring was untrue." Doc. 54, Opposition, at 5, 22-23. However, Susan Moore said that DeGrange himself "apologized greatly that he had misspoke and that what he had told us wasn't accurate, that Mr. Cavanaugh was not retiring."[4] Doc. 45, Ex, G. Moore Deposition, at 73:15-17. Cavanaugh also alleges that "John Tienken had heard rumors at sales meetings at Unisource about Richard Cavanaugh retiring in the Fresno office in the presence of other sales representatives," but the portion of the deposition cited to discusses a completely different topic. Doc. 54, Opposition, at 5:24-26. Cavanaugh has not pointed to any other evidence that there were any rumors floating around about Cavanaugh's retirement. Cavanaugh does state that Mangasarian asked Cavanaugh if he was retiring when the

---

[4] The truth of the matter (whether Cavanaugh was retiring) is not at issue. The statement is offered for the purpose of showing knowledge on the part of Susan Moore, which contradicts Cavanaugh's implicit claim that Unisource did not correct DeGrange's false representations.

ProDocument account was reassigned. Doc. 54, Opposition, at 5:26-28.  Mangasarian explained that the reason the question was asked was "Just curiosity. I mean, that's talked about at different times with different people. I'm not talking about Richard [Cavanaugh], you know, I talk about when I want to retire and everything else." Doc. 59, Ex. 5, Mangasarian Deposition, at 48:21-24. Further, Cavanaugh states that "Mangasarian disagreed with the reassignment [of the Dumont account] because he knew Cavanaugh's relationship with the customer and that Cavanaugh would be the best sales person to get the business back....Mangasarian thought a younger person was not better to handle the Dumont account." Doc. 54, Opposition, at 4:15-5:3.  No indication of age discrimination can possibly be drawn from Mangasarian's question concerning retirement given Cavanaugh's own admission that Mangasarian has always supported keeping him on his accounts.  Cavanaugh admits that he knows of no instance when anyone in Unisource management ever made a comment about his age to anyone. Doc. 45, Ex. A, Cavanaugh, Deposition, at 113:10-114:3.

  Isolated and "'stray' remarks are insufficient to establish discrimination" without other indicia of discriminatory intent. <u>Merrick v. Farmers Ins. Group</u>, 892 F.2d 1434, 1438 (9th Cir. 1990).  Indeed, "remarks...when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision-maker in issue." <u>Smith v. Firestone Tire & Rubber Co.</u>, 875 F.2d 1325, 1330 (7th Cir. 1989).  While DeGrange's statement about retirement and Quallick's alleged comment about "young blood" arguably touch upon the decisional process, they are not that significant.  Taken as a whole, the comments referred to provide only marginal support for any finding of discrimination.

  The ProDocument account was reassigned to Tienken who was 53 years old in 2003. See Doc. 39, Tienken Declaration, at 1:26.  Tienken is roughly 10 years younger than Cavanaugh.  A difference in age of even 7 years "could reasonably be described as 'significant.'" <u>Hersant v. Department of Social Services</u>, 57 Cal. App. 4th 997, 1006 (Cal. Ct. App. 1997).  The Dumont account was assigned to DeGrange who is decades younger.  However, Cavanaugh states "The only reason Quallick chose DeGrange [to take the Dumont account] was because DeGrange

14

needed accounts." Doc. 54, Cavanaugh's Opposition, at 14:3-4. The number of accounts DeGrange had was only about a third that of other sales representatives. Quallick states that DeGrange was assigned to handle Dumont was because "He needed more accounts....He had a small base of accounts." Doc. 59, Ex. 4, Quallick Deposition, at 74:22-75:2. Though Cavanaugh may disagree with a Unisource policy of trying to even out the workload of its sales representatives, such a policy would not facially violate FEHA. This would constitute a legitimate non-discriminatory rationale for Unisource's actions.

Other aspects of the case also act to dispel the suspicion of pretext. "When the decisionmaker is close in age to the plaintiff and is also within the protected category, the inference of discrimination is diminished. Leicht v. Hawaiian Airlines, Inc., 77 F. Supp.2d 1134, 1145 (D. Haw. 1999), reversed on other grounds at 15 Fed. Appx. 552 (9th Cir. 2001). Quallick was 53 years old and Teal was 59 in 2003. See Doc. 42, Quallick Declaration, at 1:24; Doc. 43, Teal Declaration, at 1:24. Cavanaugh was 63 at the time. While there is significant difference in age with Quallick, the difference is not large. Further, only two of Cavanaugh's accounts were reassigned; Unisource did not take away his 18 other accounts. Cavanaugh admits that he retains 15 accounts today, more than any other Fresno sales representative. Doc. 58, Cavanaugh Declaration, at 1:27-28.

**4. No Age Discrimination**

Dismissing or demoting an employee for failing to adequately do the job or for failing to do what an employer asks is considered legitimate and non-discriminatory. One useful comparison age discrimination case is Hersant v. Department of Social Services, 57 Cal. App. 4th 997 (Cal. Ct. App. 1997), petition for review denied at 1998 Cal. LEXIS 205. There, plaintiff Hersant was demoted by his employer. The Department alleged that Hersant contravened policy by keeping some cases open which should have been closed in order to inflate the appearance of his caseload. Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1006-7 (Cal. Ct. App. 1997). "Hersant presented evidence showing there was no validity to any of the stated bases for his demotion." Hersant v. Department of Social Services, 57 Cal. App. 4th

997, 1007 (Cal. Ct. App. 1997). Hersant also alleged that his direct supervisor had expressed concerns about his age, seniority, and hearing status. Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1009 (Cal. Ct. App. 1997). In the end, the court concluded that "Hersant raised triable issues concerning whether the actions of Department were reasonable and well considered. A trier of fact could find either they were or they were not. What a trier of fact could not reasonably conclude, however, was that Department's stated reasons were implausible, or inconsistent or baseless; it would not be reasonable to conclude they were pretextual and used merely to veil an act of age discrimination." Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1009 (Cal. Ct. App. 1997).

Where an employer's proffered legitimate non-discriminatory rationale is creditable on its face and supported by competent and admissible evidence, an employee bears a significant burden of showing that the reason is pretextual. At base, "the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 361 (Cal. 2000). The consensus is that "to avoid summary judgment, an employee claiming discrimination must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." Hersant v. Department of Social Services, 57 Cal. App. 4th 997, 1004-1005 (Cal. Ct. App. 1997). Unisource has presented substantial uncontroverted evidence that Cavanaugh was removed from the accounts because the clients were dissatisfied with his service and shifting their purchases to competitors. Cavanaugh has not presented substantial evidence that Unisource's stated rationale is pretextual; taken as a whole, the evidence is insufficient to allow a rational factfinder to find that Unisource's motive in reassigning the accounts was based, even in part, on age discrimination.

Summary judgment on the age discrimination claim is granted.

**B. Wrongful Termination in Violation of Public Policy**

Cavanaugh based his violation of public policy claim on the argument that Article 1, Section 8 of the California Constitution "requires Defendants to refrain from discriminating against any employee on the basis of age." Doc. 1, Complaint, at 4:3-4.  Unisource correctly points out that Article 1, Section 8 addresses many kinds of discrimination in employment, but not age.  Notwithstanding, it is well known that FEHA does prohibit age discrimination.  Though Cavanaugh did not cite to FEHA, the allegations in the complaint are sufficient to put Unisource on notice of the public policy claim.  Unisource argues that FEHA can not be the basis for Cavanaugh's claim as "No court has ever recognized a public policy age claim. Thus, Plaintiff's public policy claim must fail."Doc. 47, Unisource's Brief, at 21:25-27.  However, the California Supreme Court has clearly stated, "the FEHA's policy against age discrimination in employment is sufficiently substantial and fundamental to support a tort claim for wrongful discharge. We therefore conclude that the FEHA's policy against age discrimination satisfies each of the four requirements that this court has established as essential to support a common law tort claim for wrongful discharge in violation of public policy." Stevenson v. Superior Court, 16 Cal. 4th 880, 897 (Cal. 1997).

Unisource then claims that the violation of public policy claim is superfluous as it is completely derivative of his statutory age discrimination claim, stating that "As California courts repeatedly have held with respect to such superfluous claims, this claim should be dismissed." Doc. 47, Unisource's Brief, at 22:3-5.  The case law cited for such a proposition does not in fact show that violation of public policy claims have been dismissed as duplicative. See Shoemaker v. Myers, 52 Cal. 3d 1, 23 (Cal. 1990) (did not find violation of public policy claim duplicative but remanded to court of appeals to review that claim on other grounds); Rodrigues v. Campbell Industries, 87 Cal. App. 3d 494, 501 (Cal. Ct. App. 1978) (dealing with admiralty and products liability law, not employment law).  Unisource is correct that the public policy claim is dependent upon the underlying age discrimination claim. Sanders v. Arneson Prods., 91 F.3d 1351, 1354 (9th Cir. 1996), citing Jennings v. Marralle, 8 Cal. 4th 121, 135-6 (Cal. 1994).

As summary judgment has been granted on the age discrimination claim, summary

17

judgment is similarly granted on the public policy claim.

### C. Intentional Interference with Prospective Economic Advantage

Unisource asserts that Cavanaugh's claim of intentional interference must fail as a matter of law. Cavanaugh does not respond to Unisource's argument in its opposition. The cause of action requires: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153 (Cal. 2003), citing Westside Center Associates v. Safeway Stores 23, Inc., 42 Cal.App.4th 507, 521-2 (Cal. Ct. App. 1996). Unisource alleges that Cavanaugh had no economic relationship with a third party since "the economic relationship lies between Unisource and Unisource's customers, as Unisource policy dictates that all sales accounts belong to Unisource, not sales representatives....Unisource, not Unisource's customers, pays Plaintiff's salary and commissions." Doc. 47, Unisource Brief, at 23:10-14. "One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers--interlopers who have no legitimate interest in the scope or course of the contract's performance." Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 514 (Cal. 1994). Where a sales representative is paid commission on sales to third parties by the employer, no claim of interference with prospective advantage by the sales representative will lie against the employer. See Comwest, Inc. v. American Operator Services, Inc., 765 F. Supp. 1467, 1472 (C.D. Cal. 1991).

Summary judgment on the intentional interference with prospective economic advantage claim is granted.

### D. Breach of Implied Covenant of Good Faith and Fair Dealing

Unisource alleges that Cavanaugh's employment is at-will. Donna Tkel, Unisource's HR Director, states that Cavanaugh's employment is at-will and that "Plaintiff does not have a contract for employment with Unisource." Doc. 44, Tkel Declaration, at 8:5-11; Exhibit L, at 20. Cavanaugh disputes the "at-will" characterization of his employment status. Doc. 55, Cavanaugh's Separate Statement of UMF, at 33:20-23. However, the court can not find the specific evidence Cavanaugh cites to (deposition of Vince Clubb page 78:8-21) as the basis for his position regarding employment status. See Doc. 59, Ex. 2, Clubb Deposition. As no contrary evidence is presented, Unisource's characterization is accepted. In discussing an at-will employment relationship, the California Supreme Court has clearly stated that "the remedy for breach of an employment agreement, including the covenant of good faith and fair dealing implied by law therein, is solely contractual. In the employment context, an implied covenant theory affords no separate measure of recovery, such as tort damages. Allegations that the breach was wrongful, in bad faith, arbitrary, and unfair are unavailing; there is no tort of 'bad faith breach' of an employment contract."[5] Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 351 (Cal. 2000).

Summary judgment on the breach of implied covenant of good faith and fair dealing claim is granted.

\ \ \
\ \ \
\ \ \
\ \ \
\ \ \

---

[5]The rationale for this rule is that "A breach of the contract may also constitute a breach of the implied covenant of good faith and fair dealing. But insofar as the employer's acts are directly actionable as a breach of an implied-in-fact contract term, a claim that merely realleges that breach as a violation of the covenant is superfluous." Guz v. Bechtel Nat., Inc., 24 Cal. 4th 317, 352 (Cal. 2000). Cavanaugh has not alleged a breach of contract claim. See Doc. 1, Complaint. However, the allegations of the complaint relate solely to age discrimination and not to any other wrongful actions that might have violated the employment contract. Therefore, Cavanaugh's claim for breach of implied covenant of good faith and fair dealing is derivative of the age discrimination claim, and may safely be termed superfluous in this suit.

## IV. Order

Defendant Unisource's motion for summary judgment is GRANTED. The clerk is directed to enter judgment in favor of the Defendant and to close the case. The pending pretrial conference scheduled for March 28, 2007 and the trial date of May 1, 2007 are vacated.

IT IS SO ORDERED.

Dated:     **March 23, 2007**                    /s/ Anthony W. Ishii
0m8i78                                                       UNITED STATES DISTRICT JUDGE